IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CASE NO. 06-9067-M-01 |
| ) | |
| CHRISTY N. SAUNIER, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

Defendant was charged in a single-count Information with taking and carrying away, with intent to steal or purloin, personal property of Lisa Thomas, not in excess of $1,000, in violation of 18 U.S.C. § 661. (Doc. 1.) The personal property at issue was a camera, and the Information alleged that the offense was conducted on Fort Riley, Kansas, a federal military installation in the District of Kansas, on or about May 18, 2005. Defendant entered a plea of not guilty and consented to trial before a United States Magistrate Judge. (Doc. 12, 13.) The trial was held on January 11, 2007 at Fort Riley, Kansas. The Government appeared through Special Assistant U.S. Attorney John W. Roberts; Defendant appeared through appointed counsel, John Henderson, Jr., Assistant Federal Public Defender.

The Government called no witnesses, but proceeded solely by introduction of Government Ex. A, which consists of the investigative file of the Military Police. The exhibit was admitted without objection,[1] and the Government rested.

Defendant called four witnesses: Defendant, Christy Saunier; Lisa Thomas; Captain Tim Brown, Junction City, Kansas Police Department; and Lieutenant Jeff Giles, Junction City, Kansas Police Department. Defendant then rested.

There was no rebuttal, and the Court heard closing arguments from counsel. The Court then took the matter under advisement. The Court is now prepared to rule.

## FACTS

Defendant testified that in May, 2005, she was working in a janitorial position at Ft. Riley Elementary School. She had worked there for only 1½ to 2 months. One of the classrooms she cleaned was used by Lisa Thomas. Thomas had a camera used in her class projects which Defendant testified was kept on top of a bookcase next to a wastebasket. Defendant testified that on occasion she

---

[1] Defendant had originally been placed on diversion and had signed an Agreement for Pretrial Diversion of an Offender. (Doc. 7, 8.) The Government subsequently moved to revoke Defendant's diversion for failure to comply with the required conditions (Doc. 10), and the Court entered an Order Revoking Diversion. (Doc. 15.) The Agreement for Pretrial Diversion signed by Defendant contained the agreement and stipulation that if prosecution of the case were ever resumed, "Defendant stipulates to make no objection to the introduction and admission of investigative evidence and reports which the Government now has in its possession and seeks to use as evidence in the case." (Doc. 7.)

2

would find things in the wastebasket (such as pictures) that had been knocked off the bookcase by mistake. As the school year was ending, many things from the classrooms were simply thrown away by the teacher such as pencil sharpeners, carpet pieces, plants and beanbag chairs. One day in May as she was cleaning Thomas's room, she found the camera in the wastebasket. Lisa Thomas had already gone. Defendant first took the camera to the maintenance room where her supervisor, Eddie had his office. Eddie was a fill-in for a person who had had back surgery. The camera remained in Eddie's office for 3-3½ weeks. Then Eddie told the janitors that he was going to throw away any things like the camera that had not been claimed, and anyone who wanted an item could take it home. She took the camera home, sat it on her microwave in the kitchen, but never used it. Defendant testified that he camera was not working and she tried to find out what was wrong with it. She testified that she never intended to steal the camera. She acknowledged that she should have asked Lisa Thomas about the camera, but did not do so.

    Lisa Thomas testified that she remembers keeping the camera on her desk, but could have kept it on the bookcase. The camera came up missing about May 18, 2005, when Thomas had her class out of the school on a field trip. The next week she wanted to use the camera and could not find it. She immediately

reported the loss to the principal.  When Thomas returned from summer vacation, she found some other things missing.  Ultimately, the camera was returned to her by the Military Police.  The camera was in working order and she still has it.  She paid $129 for the camera.

Captain Brown testified that the Junction City Police Department was contacted by Defendant's boyfriend, Mr. Nicholson, about September 15, 2005.  Nicholson had the police department come to Defendant's residence to "stand by" while he obtained the return of some of his personal property from Defendant's home.  There had been a dispute between Nicholson and Defendant, and Brown indicated that their relationship appeared stormy.  Nicholson reported to Officer Hawes that Defendant had a stolen camera in her home.  Later, on September 21, 2005, Brown and Lieutenant Giles went to Defendant's home to talk to her about the camera, but Defendant was at work.  Giles remained at the house while Brown went to Defendant's place of employment to attempt to talk with her.  While Brown was gone, Defendant came back to the house.  Giles told her why he was there.  Defendant was cooperative and invited Giles into her home where he saw a camera sitting on a microwave oven.  She told Giles this was the camera he was asking about.  At that time, Brown returned and took over, so Giles left.

Brown asked Defendant to explain why she had the camera.  She told Brown

that she found it in a trash can at school, took it to the head custodian (Eddie's) office, then later took it home when Eddie said to clean things out.

The investigative file (Government Ex. A) contained reports from the MP's, along with a sworn statement from MP Investigator Jacob Robert Hammersley, a report from the Junction City Police Department, with an attached Law Enforcement Affidavit/Narrative by Captain Brown, and witness statements from: (1) Lisa Thomas; (2) Monica Gill; and (3) Thomas Nicholson.

In Lisa Thomas' statement of September 14, 2005, she stated that she had waited to report the camera stolen because she did not have any proof as to who had taken it. However, a few days before her statement, Monica Gill came forward and stated that she had seen a camera fitting the description of the one taken from school in Defendant's possession.

Monica Jane Gill gave her statement on October 5, 2005. Gill was a custodian at Ft. Riley Elementary School. Her head custodian asked if she had seen the camera that was missing. In June 2005, she saw the camera when Defendant used it to take pictures at her son's birthday party. Defendant told Gill that she bought the camera. Defendant also knew Gill's brother, Marcus, and Defendant told Marcus that she took the when it was left behind at the school. Gill further stated that during the three months Defendant worked at the school, about

$500 was taken. Gill further stated that Defendant lies a lot.[2]

Thomas Nicholson also gave a statement on October 5, 2005. He stated that Defendant is a chronic kleptomaniac, had taken drugs from a lady in Ogden and had taken $40 from a teacher's purse. Nicholson admitted that he had not been a witness to any of these crimes.

## DISCUSSION

The Government's burden of proving that Defendant is guilty beyond a reasonable doubt is a Constitutional cornerstone of the criminal justice system, as is its corollary, the presumption of innocense of the Defendant. <u>United States v. Pepe</u>, 501 F.2d 1142, 1143 (10th Cir. 1974). In defining reasonable doubt, it is not necessary that the Government prove guilt beyond all possible doubt. <u>United States v. Jacobson</u>, 578 F.2d 863, 866 (10th Cir. 1978). Based mainly on the cases of <u>Tillman v. Cook</u>, 215 F.2d 1116, 1126 (10th Cir. 2000) and <u>United States v. Litchfield</u>, 959 F.2d 1514, 1520-21 (10th Cir. 1992), the Tenth Circuit has adopted

---

[2] The Law Enforcement Affidavit/Narrative by Captain Brown of the Junction City Police Department dated September 23, 2005, contains his summary of his earlier interview with Gill. It states that Gill and her brother both worked as custodians at the school, and that her brother, Marcus, was, or had been, Defendant's boyfriend. It also recites that the birthday party for Defendant's son was held in July 2005, and that Gill had attended the party and saw Defendant using the camera. When she asked Defendant where she got the camera, Defendant said she bought it. Gill became suspicious and talked with her brother who said Defendant brought the camera home from school one day saying it had been left behind. Government's Ex. A.

6

the following jury instruction defining "reasonable doubt:"

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.  There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.  It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt.  A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case.  If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty.  If, on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

TENTH CIRCUIT, PATTERN JURY INSTRUCTIONS (Criminal) (2005 Edition), § 1.05 (hereafter "PATTERN INSTRUCTIONS").

In this case, Defendant admits that she took and carried away the camera of Lisa Thomas, which is personal property.  The evidence is undisputed that the camera cost less than $1,000.  The only factual issue remaining is whether Defendant had the intent to steal the camera.  Defendant has testified that she did not intend to steal the camera.  In deciding whether or not the Government has met its burden of proving beyond a reasonable doubt that Defendant intended to steal the camera, the Court, as the fact-finder, must consider all of the evidence, both testimony of the witnesses and also the exhibits that were admitted into evidence.

In reaching its decision, however, the Court does not have to accept all of the evidence as true or accurate. In deciding what evidence to accept as true, the Court must consider the credibility of the witnesses on the issue of Defendant's intent.

In this case, the Government has relied solely on "testimony" of "witnesses" who did not actually appear at trial. Instead of calling live witnesses, the Government chose to simply introduce its investigative reports, including witness statements. In deciding whether to accept these written reports and statements as true, the court must also consider the issue of credibility just as if the persons who made the statements had actually appeared and testified in court.

The Court finds that the testimony of Thomas Nicholson lacks any credibility in this case. The Junction City police officers observing both Nicholson and Defendant described their relationship as rocky and Nicholson made his statement about Defendant's possession of Thomas' stolen camera on the day he was receiving assistance from the police department in retrieving his personal effects from Defendant's home. When Nicholson and Defendant later got back together, Nicholson would not repeat these charges to the police officer investigating the case, and only said that Defendant just brought the camera home one day. Nicholson clearly structured his "testimony" depending on the status of his relationship with Defendant.

The statement by Monica Gill seems, on its face, to be believable. However, the Court has not had the opportunity to observe the witness, and Defendant's counsel has not had the opportunity to cross-examine her. This makes it difficult to assess Gill's credibility. *Cf.* PATTERN INSTRUCTION, § 1.08 (describing matters that are important to a determination of credibility of a witness, including the Defendant).[3] On one point, her testimony is consistent with the live testimony given by Thomas – the camera worked and was not broken – a point at odds with Defendant's testimony that the camera did not work, that she tried to find out what was wrong with it, and she never used the camera. On the issue of Defendant's intent, Gill's statement that Defendant told her that Defendant had bought the camera would indicate that Defendant was attempting to hide facts about the camera from a co-worker. That co-worker was in a position to know about the missing camera at school and to report Defendant if Gill thought it was the same camera.

While the diversion agreement allows introduction of the investigative reports in this case, this is very different from the provision used in other diversion

---

[3] In addition, by using the written statement, the Government has also introduced a certain degree of hearsay along with Gill's direct "testimony." In her statement, she reported what her brother said to her about how Defendant came to possess the camera. Had she been testifying live at trial, the Defendant would have had an opportunity to object to these portions of her testimony as hearsay.

9

agreements where the parties stipulate that the Government's evidence would be adequate to convict the defendant of the offense charged in the case. *Cf*. ***U.S. v. Madden***, 221 F.3d 1353, 2000 WL 966436, *1, *3 (10th Cir. 2000). Thus, while the investigative reports are admissible, the court must still assess the credibility and reliability of those reports in reaching a verdict in this case. After reviewing the reports thoroughly, the court concludes that those reports – particularly the portions by and about Nicholson and Gill – do not constitute credible evidence that is persuasive in this case.[4]

This leaves the live testimony of the witnesses. The Court observed Thomas, Brown and Giles as they testified, and finds their testimony to be very credible. Unfortunately, however, Thomas' testimony does not add much to the issue of Defendant's intent. Giles' testimony concerning Defendant's intent is indirect in nature, in that he confirmed that when he met Defendant at her home

---

[4] The court is bothered by the fact that the Government apparently made <u>no</u> attempt to ascertain whether any of the witnesses, particularly Gill and Nicholson, were available and could be subpoenaed to appear at trial. The Government made no representation that any of the witnesses were beyond the court's subpoena power. This is far different from a situation where the criminal investigator on a case has been deployed or has left the military and is no longer available to testify about his or her investigation. There is no evidence that that is the situation in this case. In fact, Defendant was able to subpoena several of the people who had either authored parts of the reports or had given statements included in the investigative reports such as Brown, Giles and Thomas. Obviously, since those individuals testified at trial and their credibility could be assessed by the court, the portions of the investigative reports concerning those individuals became superfluous.

10

and told her why he was there, she fully cooperated, allowed him to enter the home, and pointed out the camera. Defendant argues that this is an indication that she had done nothing wrong. Brown's testimony also did not add much to the question of Defendant's intent. He testified that Defendant had told him that she found the camera in the wastebasket at school, took it to the head custodian's office, and only brought it home when the head custodian told the janitors to take what they wanted before he threw it out. This is precisely the testimony given by Defendant at trial. He also testified about his interview with Nicholson, but unfortunately, he was not questioned about his interview with Gill.

      The Court also observed the Defendant as she testified. Her testimony varied from that of Thomas on several minor points: where the camera was kept in the classroom, whether there had been other items knocked into the wastebasket in the past from the bookshelf, and whether Thomas had previously given Defendant some maps from the classroom to take home. On these minor points, Thomas simply indicated that she could not remember specifically some of these things. There is a major discrepancy, however, concerning whether the camera was in working condition. Defendant testified that it did not work and that she could not find out what was wrong with it. Thomas, however, testified that the camera was working right before it turned up missing, and, more importantly, that it worked

when it was returned to her by the MP's after it was recovered from Defendant's home. If, as Defendant testified, the camera was not working in May 2005, this would tend to support Defendant's statement that she believed that the camera had been thrown away. On the other hand, if the camera was working, as Thomas testified, it is unlikely that anyone would throw it in the trash, and unlikely that anyone finding it could reasonably believe that it was trash. This bears directly on Defendant's intent when she took the camera.

If this were a civil case where the burden of proof is by a preponderance of the evidence, the court could easily find from the evidence presented that Saunier knew that the camera was in working order and therefore that the camera was not intentionally discarded by Thomas. The court could then conclude that Saunier knowingly took the camera. However, from the evidence presented by the Government in this criminal case the court cannot find that the Government has met its burden of proving beyond a reasonable doubt that Saunier intended to steal the camera.

IT IS THEREFORE ORDERED that Defendant, Christy N. Saunier is found

not guilty of the charges set out in the Information in this case.

Dated this 18th day of December, 2007.

                                                s/   DONALD W. BOSTWICK
                                                   U.S. Magistrate Judge